# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TONY COX,<br><br>            Plaintiff,<br><br>      v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, et al.,<br><br>            Defendants. | No.  2:17-cv-00989-MCE-CKD<br><br>**MEMORANDUM AND ORDER** |

Through the present lawsuit, Plaintiff Tony Cox ("Plaintiff") alleges he suffered catastrophic injuries due to substandard care he received both while incarcerated at Folsom State Prison ("FSP") and San Joaquin General Hospital ("SJGH").  Plaintiff's currently operative pleading, the Fourth Amended Complaint ("FAC"), seeks to recover for those injuries from the County of San Joaquin, doing business as SJGH, (hereafter referred to as either the "County" or "SJGH") and prison employees Kiranbir Dhillon, M.D. ("Dhillon"), and Registered Nurse Jeffrey Meinzer ("Meinzer") (Dhillon and Meinzer referred to together hereafter as the "individual Defendants").  Presently before the Court are two Motions for Summary Judgment, one filed by the County, and one filed by the individual Defendants.  ECF Nos. 79 and 85.  For the following reasons, those Motions

are GRANTED.[1]

## BACKGROUND[2]

At all relevant times, Plaintiff was a California resident incarcerated with the California Department of Corrections and Rehabilitation ("CDCR"). Plaintiff alleges that he had suffered from serious back pain and other medical issues since May 2015, and he purportedly informed various non-defendant CDCR personnel of these issues through March 2016.

At some point apparently in the spring of 2016, Plaintiff was transferred to FSP and, as a new transferee, was scheduled to see a primary care physician ("PCP") for an initial medical examination. On April 11, 2016, Dhillon provided PCP services to Plaintiff for the first time. This appointment consisted of an examination, an interview with Plaintiff, and a review of Plaintiff's pertinent medical history.

Plaintiff indicated that he had a history of lower back pain and a motor vehicle accident. An X-ray had purportedly been completed on July 31, 2015, but those results were not available to Dhillon. In addition, handwritten notes pertaining to a November 6, 2015, X-ray indicated that Plaintiff's lumbar spine L5-S1 level had shown moderate degenerative changes with possible spinal bifid process at L5 level. Dhillon was unable to clearly make out the latter portion of the handwritten note regarding the spinal bifid process, but Plaintiff reported that he received the results which stated all his labs were within normal limits. Plaintiff reported that he previously had sciatica-like symptoms which had resolved and that he no longer wanted to take the prescription Trileptal, a chronic pain medication that also has uses for mental health related issues. Dhillon and Plaintiff discussed tapering off of this medication, but Plaintiff advised that he had

---

[1] Because oral argument would not have been of material assistance, the Court declined to set a hearing date and decides this matter on the briefs. E.D. Local Rule 230(g).

[2] The following facts are taken, primarily verbatim, from the parties' papers.

already refused to take the medication for the ten days leading up to the appointment. Plaintiff then signed a refusal to continue Trileptal.

Dhillon also performed a physical exam of Plaintiff which indicated, among other things, that Plaintiff was well-nourished, was not in acute distress, was alert and orientated, had normal speech, a steady gait, was able to raise his legs to 90 degrees from bilateral sitting, had no focal weakness or sensory loss in all extremities, and had a range of motion that appeared to be within normal limits. Dhillon created an Assessment/Plan for Plaintiff and recorded that Plaintiff's lumbago, in reference to his back pain history, was not an active issue. Dhillon discontinued the Trileptal per his directions. Plaintiff's diet was described as appropriate, and Dhillon discussed a weight loss goal with Plaintiff as well as educated him as to avoid the use of illicit substances. Dhillon informed him to return to the clinic as scheduled or sooner, if necessary.[3]

On April 22, 2016, Plaintiff submitted a CDCR 7326 form requesting medical attention for complaints of back pain and spasms. On that form, Plaintiff complained, "I hurt my lower back and I can barely get out of bed or walk." Decl. of John Parker, Jr., ECF No. 90-1, Ex. F.

On April 25, 2016, Meinzer met with Plaintiff at a prison clinic to conduct an examination regarding this complaint. Plaintiff reported that he had injured himself working out approximately a week prior and that he had suffered a herniated disc as a child. Meinzer recorded that Plaintiff's mode of arrival for the examination was ambulatory. He physically examined Plaintiff, checking his vital signs and completing a pain assessment. Plaintiff's cardiac rhythm was regular; his respiratory pattern was regular and unlabored; his pupils were equal, round, and reactive to light; and he had no deficiencies in sensation/feeling in his fingertips, hands, feet, and no difficulty moving his limbs. Plaintiff reported that his pain was a 10 on a scale of 1 to 10. According to

---

[3] Plaintiff ostensibly purports to dispute Dhillon's account of this April 11 visit. See Pl.'s Response to Defs.' Statement of Supposedly Undisputed Facts, ECF No. 91, Nos. 6-8. However, none of Plaintiff's cited evidence actually contradicts the facts Defendants have offered with regard to this intake assessment.

3

Plaintiff, he advised Meinzer that his pain was so unbearable that he needed to go to a hospital. Meinzer conducted a musculoskeletal joint assessment and noted that Plaintiff had muscle tightness and limited range of motion in the lumbosacral spine. Plaintiff reported that he had no issue urinating or having a bowel movement, and he had no chills, no fever, no loss of appetite, and no night sweats.

Based on Meinzer's examination, including Plaintiff's symptoms and reported issues, and pursuant to the applicable Episodic Nurse and Musculoskeletal Lower Back Pain protocols, Meinzer determined Plaintiff's condition was not required to be elevated to a doctor. Meinzer nonetheless contacted Dhillon to report his examination. Meinzer described the examination, and, pursuant to Dhillon's pattern and practice, she requested a summary of Meinzer's evaluation and asked her own screening questions. Dhillon then ordered that Plaintiff be provided Tylenol #3, a narcotic pain reliever, and Docusate, which is prescribed to counteract the possible constipation side effects of the Tylenol #3. Meinzer referred Plaintiff for a follow-up medical visit at the medical clinic to occur within 14 days and scheduled a follow-up medical visit with a registered nurse to occur within 3-5 days. Meinzer does not recollect any further interaction with Plaintiff following the April 25, 2016, examination. Dhillon did not have any contact with Plaintiff on April 25, 2016, and did not have any contact with Plaintiff or anyone else regarding Plaintiff until May 2, 2016.

Over the following eight days, Plaintiff's symptoms worsened, and he alleges he made numerous requests to see a doctor, although there is no evidence of any such requests in the record. Nor is there any indication that either Meinzer or Dhillon were made aware of any requests. Eventually, on May 2, 2016, Plaintiff was in such severe pain that he was forced to go "man down"[4] so jail staff would allow him to be seen by a medical professional.

Dhillon evaluated Plaintiff in the early afternoon that day as an add-on patient at

---

[4] In FSP, "man down" is a procedure in which an inmate can inform a guard that he needs a gurney and needs to be taken to a medical professional as soon as possible.

4

the medical clinic. An add-on patient evaluation occurs when a patient has a specific complaint but no scheduled appointment. Plaintiff complained of back pain, which had been occurring for 9 days. As part of Dhillon's examination, she took Plaintiff's History of Present Illness. Plaintiff reported that he had injured his back approximately 7-10 days prior after a workout. Plaintiff reported that codeine provided to him did not help and that he had run out of Motrin. Plaintiff had been seen earlier that morning at the Treatment and Triage Area and had been given Toradol, an anti-inflammatory drug used for the treatment of moderate to severe pain in adults. There were no reports of foot drop, bowel bladder dysfunction, and saddle anesthesia. Plaintiff reported that he felt tight and could not move his legs. He denied any cough, chest pain, or shortness of breath. Plaintiff was not cooperative with his history and did not inform Dhillon whether he had a bowel movement, thus Dhillon could not review Plaintiff's systems.[5]

Dhillon was able to conduct a physical exam, which indicated that Plaintiff had a fever, was well-nourished, and appeared in distress due to his pain. She reviewed his eyes, heart, lungs, and abdomen, and she conducted a neurologic exam that was again limited by Plaintiff's lack of cooperation. Dhillon created an Assessment/Plan for Plaintiff. She indicated that Plaintiff had a fever and that there was an unclear etiology. Possible differentials included upper respiratory infection, tuberculosis, cocci, spinal abscess, and possible cord compression. Dhillon indicated a need for labs, imaging, and a higher level of care. She ordered registered nurses at the Triage and Treatment Clinic to start IV fluids and provide Tylenol, EKG, morphine, and a code two for elevated care.

She then crafted and submitted orders to have Plaintiff transferred due to his acute lower back pain, fever, and chills. Dhillon indicated that emergent care was needed to conduct labs and imaging to rule out a possible infection, and Dhillon requested an ambulance take Plaintiff to a hospital. Her request was approved that

---

[5] The record does not indicate whether this lack of cooperation was because Plaintiff refused to assist or was unable to do so given his physical condition. It is not material to the parties' disputes, but for the record, the Court infers the latter.

same day, after which Dhillon had no further contact with Plaintiff.

In conformity with Dhillon's request, Plaintiff was transferred via ambulance to SJGH. When he arrived at SJGH, Plaintiff reported severe low back pain, numbness, difficulty walking, mid-back pain, incontinence, and a fever. According to Plaintiff, County's nurses and orderlies transferred him to an examining table without the use of a back board. In addition, Plaintiff contends, County's staff eventually instructed him to move himself onto another gurney to be taken for an MRI scan. Plaintiff purportedly objected, but the SJGH employees then forcefully grabbed Plaintiff at one end by his shoulders and shirt and at the other end by the ankles and swung him onto the gurney striking his back on it in the process.[6]

Plaintiff felt a twinge around his shoulder and then purportedly felt his whole body go numb and limp. Plaintiff advised County's employees that he could not feel his arms and could not move. He was then taken for the MRI, which revealed that Plaintiff suffered from an epidural abscess with extensive fluid collection. Plaintiff underwent emergency surgery but was nonetheless rendered quadriplegic.

Plaintiff thereafter initiated this action against a variety of involved parties. Before the Court for adjudication are Plaintiff's claims for: (1) medical malpractice against the County; and (2) deliberate indifference to serious medical needs and inhumane conditions of confinement in violation of the Eighth Amendment against the individual Defendants pursuant to 42 U.S.C. § 1983.

## STANDARD

The Federal Rules of Civil Procedure[7] provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is

---

[6] Plaintiff avers that the County did not follow policies or protocols in performing gurney transfer or perform the transfer in accordance with the accepted standard of care. In fact, according to Plaintiff, SJGH has no policy or procedure specifically with respect to gurney transfers.

[7] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure.

1 entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992).  The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).  As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

### A.     The County is immune from suit.[8]

"Public entities in California are not liable for tortious injury unless liability is

---

[8] The Court declines to disregard Plaintiff's Opposition as untimely and will consider the merits of the parties' arguments.

imposed by statute." Castaneda v. Dep't of Corr. & Rehab., 212 Cal. App. 4th 1051, 1069 (2013). Under California Government Code § 844.6, subject to certain exceptions, such entities are "not liable for . . . [a]n injury to any prisoner." Cal. Gov't Code § 844.6(a)(2). Moreover, Government Code § 845.6 "both affirms [a] public entity immunity to liability for furnishing medical care, and creates a narrow exception to that immunity." Castaneda, 212 Cal. App. 4th at 1070. That section provides:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, except as otherwise provided by Sections 855.8 and 856, a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care.

Cal. Gov't Code § 845.6. "Section 845.6 is very narrowly written to authorize a cause of action against a public entity for its employees' failure to summon immediate medical care only, not for certain employee's malpractice in providing that care." Castaneda, 212 Cal. App. 4th at 1070. "Thus, section 845.6 creates out of the general immunity a limited cause of action against a public entity for its employees' failure to summon immediate medical care only." Id. "The statute does not create liability of the public entity for malpractice in furnishing or obtaining that medical care." Id. Because Plaintiff has pled only a medical malpractice claim against the County for care rendered when he was a prisoner, the County is entitled to immunity.

Recognizing this, Plaintiff argues in his opposition instead that:

> The County violated California Labor Code, § 6403.5 and Title 8, California Code of Regulations, § 5120 ("Section 5120") by not having a patient handling policy in place as required at SJGH. Because the County failed to discharge its legal duty to implement such a policy, under Gov. Code 815.6, the County can be held liable at trial in this matter.

Pl.'s Opp'n, ECF No. 83, at 3. Government Code § 815.6 provides that "[w]here a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that

9

kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." Plaintiff contends that California imposes such a duty on the County by requiring that hospitals adopt a "patient protection and health care worker back and musculoskeletal injury prevention plan." Cal. Lab. Code § 6403.5. Plaintiff further contends that the County had no such plan in place at the time of his injury and thus may be held liable under Government Code § 815.6 for failure to discharge that duty.

There are several problems with this argument. First, the theory that the County has no "patient handling policy" in place and that is what led to Plaintiff's injury is not pled in the FAC. Second, Plaintiff's only evidence that the County lacked a policy is the out-of-context testimony of the hospital's person most knowledgeable that the County does not have a specific "gurney transfer policy." Decl. of John R. Parker, Jr., ECF No. 83-2, Ex. D, at 17:2-6. That witness went on to explain, however, the County has other policies and procedures in place to ensure that all medical personnel are trained in how to assess, lift, and transfer patients with suspected spinal injuries. Decl. of Stephanie Roundy, ECF No. 84-1, Ex. F. Not only are personnel trained in nursing or technical school, but they receive extensive on the job training as well. Simply put, the fact that the County does not have a specific "gurney transfer policy" does not lead to the conclusion that it failed to adopt any "patient protection and health care worker back and musculoskeletal injury prevention plan."

Third, even if that was not the case, the duty to enact patient handling policies is discretionary and thus falls outside § 815.6. See Haggis v. City of Los Angeles, 22 Cal. 4th 490, 498 (2000) (noting that a mandatory duty is not created by an enactment that obligates a public entity "to perform a function if the function itself involves the exercise of discretion"). Great discretion is left to entities like the County to craft individual policies in compliance with the extensive Labor Code provisions and regulations on which Plaintiff relies. Plaintiff has thus failed to identify a mandatory duty as required by statute. Finally, and perhaps most importantly, the imposition of a general legal duty

cannot abrogate the specific immunity provisions applicable in this case as set forth in California Government Code §§ 844.6 and 845.6.  See Creason v. Dep't of Health Serv., 18 Cal. 4th 623, 635 (1998) ("Even had plaintiffs' complaint stated a cause of action against defendant for breach of a mandatory statutory duty to formulate accurate testing and reporting standards for hypothyroidism, plaintiffs could not prevail if defendant was immune from suit.  If a specific immunity statute applies, it cannot be abrogated by a statute which simply imposes a general legal duty or liability.") (internal quotation marks and citations omitted).  Given all of the foregoing, the Court concludes that the County is immune from liability in this case and its Motion for Summary Judgment is GRANTED.

### B.     The individual Defendants are entitled to judgment as well.

Plaintiff next seeks to recover from the individual Defendants on the bases that:  (1) "[they] were deliberately indifferent to his medical needs by failing and refusing to provide him with necessary medical care"; and (2) they "subjected Plaintiff to inhumane conditions of confinement by failing to provide him medical care."  Pl.'s Opp'n, ECF No. 89, at 1.  Both theories arise under the same basic Eighth Amendment principles.

Indeed, deliberate indifference to the serious medical needs of prisoners violates the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "This . . . does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the [Constitution]."  Id. at 105.  "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment."  Id. at 106.  Instead, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).

In addition, the Eighth Amendment "imposes duties on . . . officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care."  Id. at 832.  For a plaintiff to

prevail in a "prison conditions" case, the "prison official must have a sufficiently culpable state of mind." Id. at 834 (internal quotation marks and citation omitted). "[T]hat state of mind is one of deliberate indifference to inmate health and safety." Id. (internal quotation marks and citations omitted). Accordingly, both of Plaintiff's individual claims in this case necessitate showing that the individual Defendants were deliberately indifferent to his serious medical needs. Plaintiff has not met his burden under the circumstances.

There is no dispute that Plaintiff's medical needs were serious. The issue before the Court is thus whether the individual Defendants' response to those needs was in disregard of a known and excessive risk and thus violated Plaintiff's constitutional rights. In this case, neither individual Defendant performed deficiently in the context of the Eighth Amendment.

Plaintiff does not appear to aver, nor could he, that Dhillon ignored a serious medical need when she conducted her initial assessment of Plaintiff on April 11, 2016. Plaintiff was not in any physical pain that day and advised that although he had a history of back pain, he had stopped taking prescribed pain medication and no longer wanted that medication to be administered. Dhillon performed a thorough exam of Plaintiff, including conducting a physical examination and discussing Plaintiff's medical history with him before she officially discontinued that medication in keeping with Plaintiff's request.

Plaintiff's next interaction with the individual Defendants was with Meinzer on April 25 when Plaintiff requested treatment for his back pain and spasms. Plaintiff indicated that a workout days earlier had resulted in severe back pain, rating his pain a ten out of ten on the pain scale. Meinzer conducted another physical examination of Plaintiff and observed muscle tightness and some limited range of motion. He also noted that Plaintiff had no issue relieving himself, had no fever or related symptoms, and maintained an appetite. Meinzer then contacted Dhillon, who prescribed Plaintiff a narcotic pain medication and anti-constipation medication. Meinzer also indicated that Plaintiff should follow up in the clinic within 14 days and with a registered nurse within

three to five days.

Based on these facts, Plaintiff has not shown that Meinzer was deliberately indifferent to Plaintiff's medical needs. Plaintiff sought care related to a workout injury that was causing him a great deal of pain. He was prescribed pain killers, and a follow up plan was put into place. Plaintiff has not identified any objective symptoms that would have indicated to a medical professional that his medical needs went beyond an exercise-related injury, which Meinzer treated. Accordingly, Plaintiff cannot show that Meinzer was deliberately indifferent under the circumstances.

Plaintiff's argument that he should have been transported to a hospital that day does not change this conclusion. While Plaintiff disagrees with the approach taken by Meinzer and approved by Dhillon, such a disagreement is not enough to give rise to a constitutional claim. Nor has Plaintiff provided any evidence that the applicable standard of care required the individual Defendants to seek hospitalization on that date. Indeed, if a prisoner's self-reported pain was sufficient to mandate that prison personnel transfer him to an outside medical center, it is logical to hypothesize that inmates would be making excessive demands in order to leave the confines of the prison. Moreover, an argument that Plaintiff's care fell below the applicable standard sounds in negligence; it does not allege a complete and deliberate disregard of Plaintiff's condition. In this case, Meinzer and Dhillon treated Plaintiff's pain on this date and directed medical follow up. Plaintiff has not provided any evidence to indicate more was constitutionally warranted.

Finally, Plaintiff has also failed to show that Dhillon was deliberately indifferent to Plaintiff's serious medical needs during their last visit on May 2. On that date, Plaintiff again presented with pain, but also, among other things, a fever, which led Dhillon to become concerned about a possible infection. After conducting a physical exam, Dhillon determined Plaintiff needed labs and imaging that could not be provided in the prison, so she requested he be transferred to an emergency facility via ambulance. In the meantime, Dhillon ordered that Plaintiff be provided IV fluids, morphine, and an EKG. Plaintiff was transferred to the County that same day. The evidence thus demonstrates

13

that Dhillon undertook all reasonable steps to affirmatively provide care for Plaintiff. This is simply not an instance where a medical professional disregarded a known risk. Instead, Dhillon identified a risk, treated Plaintiff's immediate symptoms and then sought and obtained approval to elevate Plaintiff's level of care.

In opposition, Plaintiff thus focuses on an alleged delay in the individual Defendants providing him care instead of the quality of the care itself. For example, Plaintiff contends that he asked to see a doctor initially after he injured his back as early as April 20, 2016. However, there is no evidence in the record to indicate that Plaintiff made a medical request before April 22, 2016, let alone that any request was sent to the individual Defendants. Plaintiff also contends he made numerous requests for medical treatment after his April 25 appointment, and he was eventually forced to go "man down" to see a doctor. Again, Plaintiff offers no evidence that he made any such requests. Nor does he provide any evidence to support the conclusion that the individual Defendants would have been aware of his requests in any event. Accordingly, this argument is insufficient to withstand summary judgment.

In sum, the individual Defendants offered evidence to show that they rendered appropriate medical care to Plaintiff on each occasion in which they came into contact. Plaintiff has proffered no evidence to create a material dispute as to whether the individual Defendants' treatment plans were reasonable or whether they delayed in treating Plaintiff. Given that, the individual Defendants' Motion is GRANTED.

## CONCLUSION

Defendants' Motions for Summary Judgment (ECF No. 79, 85) are GRANTED. The Clerk of the Court is directed to enter judgment in their favor and to close this case.

IT IS SO ORDERED.

DATED:  September 18, 2023

MORRISON C. ENGLAND, JR
SENIOR UNITED STATES DISTRICT JUDGE